IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BENJAMIN RAYMOND<br>DE LOS SANTOS,<br>                Petitioner,<br><br>   vs.<br><br>JAMES D. HARTLEY, et al.,<br><br>                Respondents.<br>_____/ | CASE NO. CV F 08-01852 LJO WMW HC<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS WITH PREJUDICE; DIRECTING CLERK OF COURT TO ENTER JUDGMENT FOR RESPONDENT** |

On December 3, 2008, Benjamin Raymond De Los Santos ("Petitioner"), a *pro se* California prisoner, filed a Petition for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254 ("Petition") in this Court[1] challenging the denial of parole on December 5, 2006.[2]

On April 3, 2009, James D. Hartley ("Respondent") filed an Answer to the Petition. On May 1, 2009, Petitioner filed a Traverse to the Answer. Thus, this matter is ready for decision.

## **PROCEDURAL HISTORY**

In 1991, Petitioner was convicted in the Fresno County Superior Court of attempted first degree

---

[1] At the time of filing the Petition, Petitioner was incarcerated at Avenal State Prison in Avenal, California. (Pet. 1.) Avenal is in Kings County, located within the venue of the United States District Court for the Eastern District of California. 28 U.S.C. § 84(b). The Petition is properly filed in this Court, located in the district that Petitioner was in custody at the time of filing the Petition. *See* 28 U.S.C. § 2241(d).

[2] Although petitions for habeas corpus relief are routinely referred to a Magistrate Judge, *see* L.R. 72-302, the Court exercises its discretion to address the Petition pursuant to Local Rule 72-302(d).

1

murder with a deadly weapon, attempted murder, and attempted voluntary manslaughter. (Pet. 1, 36.)[3] The superior court sentenced Petitioner to a determinate term of fifteen years plus life with the possibility of parole in state prison, and Petitioner began his term on June 19, 1991. (Pet. 1, 36, 158; Answer Ex. 1 at 104, 107 of 107.) The record states that Petitioner's "minimum eligible parole date" is January 5, 2005. (Pet. 36; Answer Ex. 2 at 2.)

On May 4, 2004, Petitioner was denied parole. (Pet. 88; Answer Ex. 1 at 66, 74 of 107.) On December 5, 2006, the California Board of Parole Hearings ("Board") denied Petitioner parole for a second time, and stated it would review Petitioner's suitability again in two years. (Pet. 8, 142.) The 2006 parole denial is the subject of the instant Petition.

On June 15, 2007, Petitioner filed a habeas petition in the Fresno County Superior Court challenging the Board's 2006 denial of parole. (Answer Ex. 1.) On June 28, 2007, the superior court denied the habeas petition in a reasoned opinion. (*Id.* Ex. 2.) On September 4, 2007, Petitioner filed a habeas petition in the California Court of Appeal, which summarily denied the petition on February 22, 2008. (*Id.* Exs. 3-4.) On March 3, 2008, Petitioner filed a petition for review in the California Supreme Court, which summarily denied the petition on April 16, 2008. (*Id.* Exs. 5-6.)

On December 3, 2008, Petitioner filed his federal Petition in this Court.

## **FACTUAL BACKGROUND**[4]

> PRESIDING COMMISSIONER MARTINEZ: . . . Counsel, if you have no objections, I'm going to reference the statement of facts from the May 2006 calendar Board report with some reference to . . . the Probation Officer's report . . . .
> . . . .
> "The factual data contained in the circumstances of the offense was arrived from the Superior Court of California, County of Fresno, action number 418855-3, circumstances of the offense are reprinted in this section for the perusal of the Commissioners and the general facts without the benefit of (inaudible) directions. [¶]
> Emilia Castillo, age 29, testified that she and [Petitioner] were living together off and on. He would stay with her for a few days and he would become angry and leave for a time. On February 27th of 1990, he had been staying at her apartment at 1650 (inaudible) Avenue in Seldon for

---

[3] For ease of reference, the Court utilizes the CM/ECF pagination from the Petition and from the Exhibits attached to Respondent's Answer.

[4] The Court adopts the factual background from the December 5, 2006, Board transcript as a fair and accurate summary of the evidence presented at trial. Furthermore, because Petitioner challenges the denial of parole, the Court reiterates the reasons and basis for the Board's denial from the Board transcript.

2

approximately one to two weeks straight. She lived there with her three daughters, Anna Reyes, age 11, Christina Reyes, age 9, and another daughter, age 5. [¶]

On February 27th of 1990 at approximately 1:45 a.m., Emilia and [Petitioner] had been drinking to the extend [sic] that Emilia felt that they were both drunk. They started arguing at a neighbor's apartment in the same complex where they lived. Emilia thought that the argument started because she had talked to another man. She got [Petitioner] to return to their apartment and when they got there, she told him to leave as she did not want to argue all night. He refused and they argued about that. This took place in the living room and her three girls were asleep in another room. Finally, [Petitioner] gathered his belongings and put them in the living room but he still refused to leave. They argued for approximately . . . one half of one hour total. She did not remember much about what happened after that due to her intoxication. I asked her when she knew when she had been stabbed and she was lying on the floor and asking [Petitioner] to help her. [Petitioner] put a knife in her hand and kept trying to get her to stab him but she was too weak to do it. She then saw him stab himself. He kept shaking her and telling her not to die and asking her why she had made him do that to her. [¶]

Ana Reyes testified that Emilia had awakened her and told her that she was asking [Petitioner] to leave but he would not go. Emilia told him to leave saying that they did not want him there. The other two girls awakened. They also told [Petitioner] to leave and when he was sitting on the kitchen table at that point and she was also trying to get [Petitioner] to leave. This went on for approximately 15 minutes. [Petitioner] pushed Emilia with both of his hands on her chest and she pushed him in the same manner. Each told the other not to push then [Petitioner] grabbed Emilia and said, 'Don't make me do this, Emilia.' Emilia told him that she was not making him do anything and then she told him that she just wanted him to leave. [Petitioner] grabbed a knife from the kitchen counter and stabbed Emilia three times in the upper part of her body[.] [W]hile he stabbed her, he held her tightly and she struggled but she could not move. She fell on the kitchen table, stabbed her twice on the thigh. The table was glass and it broke and it landed on Anna's foot. Anna was in the process of calling 911. At that point, she turned to see what was happening and [Petitioner] stabbed her on the shoulder and side of the back. She fell to the ground and Christina ran out of the apartment and pounded on a neighbor's door. [Petitioner] followed Christina out, holding a knife and dragged her back into the apartment by her hair then he started stabbing her. She fell on her back and she pulled up her arms and knees, apparently in an attempt to protect herself. She then turned over on her stomach and he kept stabbing her. He was still holding her by the hair. [Petitioner] left Christina lying on the floor and he went into the kitchen and rinsed the knife and then he knelt and repeatedly said something to the effect of 'Lord, help me.' Then he put the knife in Emilia's hand and closed her fingers around it and tried to get her to stab him but she kept letting go of it. Anna thought (inaudible) Emilia, that Emilia might have been fainting at this point. Finally, [Petitioner] took the knife and stabbed himself in the chest with it. [Petitioner] got up, started walking around the room. He kept over to Emilia, going over to Emilia trying to keep her awake and telling her that everything is going to be all right. He called for an ambulance saying that someone had stabbed him. [¶]

Police arrived a short time later, [Petitioner] answered the door. One of

the officers who responded testified that three victims and [Petitioner] were all lying on the floor in the living room. [Petitioner] got up, started walking towards the door. Officers told him to lie down due to his injuries. Officers saw a knife on the floor within arms reach of where [Petitioner] had been lying. The room was in disarray and things, with things broken and the table overturned. The officer asked the people in the room what had happened. [Petitioner] pointed to the front door and said something to the effect that 'The guy over there stabbed us.' While they waited for an ambulance to arrive, [Petitioner] kept going over to Emilia and telling her that everything is going to be all right. [¶]

Emilia Castillo suffered three stab wounds to her left shoulder and two to her left thigh. Neither had entered her body cavity and there were no complications. She was discharged from the hospital March 2nd 1990. At the time of remission, she was lapsing in and out of consciousness. Her blood alcohol level was at 0.22 percent. [¶]

Anna Reyes suffered a stab wound to her right shoulder and another along her spine in the middle of her back. She was admitted into the hospital. She has paralysis in one leg – apparently from the spinal cord injury – was discharged from the hospital on March 9, 1990 and she was directed to receive outpatient physical therapy, possibly on a long term basis. [¶]

Christina Reyes suffered four stab wounds in the back, one in the left side, two in the right flank, one in the right tricep, one in the left big toe and possibly one in the right foot. She had difficulty breathing without oxygen after her admission and she had a chest tube inserted. She was discharged from the hospital March 10th of 1990. [¶]

[Petitioner] suffered a stab wound in the left chest. It did not enter the chest wall with no complications. He was discharged from the hospital the following day, April the 28th of 1990."

. . . .

PRESIDING COMMISSIONER MARTINEZ: . . . The Panel reviewed all information received from the public and relied on the following circumstances in concluding that [Petitioner] is not suitable for parole and would pose an unreasonable risk of danger to society, or a threat to public safety if released from prison. [¶]

We have come to this conclusion first by the commitment offense. Again, carried out in an especially cruel and callous manner. Multiple victims were attacked, injured in the same incident, again, as indicated, Ms. Emilia Castillo, along with her two daughters, Anna Reyes and Christina Reyes, Anna Reyes being 11 years old and Christina Reyes being 9 years old. Again, all were attacked and stabbed by [Petitioner]. The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering and life and, again, all indications that it was carried out in a sense of initially stabbing the mother, Emilia Castillo, and then, turning on them and stabbing the two children for reasons again stated by [Petitioner], again, in regards to that he was angry but not any concerns with that he was going to get in trouble and therefore, he wanted to prevent them from reporting it or from him being exposed as a result of what he had done. The motive for the crime, inexplicable. Again, there was discussion regarding jealousy, anger, in this situation, again possibly fear again, at this point, I don't truly understand the lack of motive other than, again, [Petitioner's] comments regarding that he was angry. These conclusions are drawn from the statement of facts where the prisoner, again, on February 27th of 1990, did, after having an argument with Emilia Castillo, his girlfriend, did stab her multiple times. When the children tried to intervene and get help for the mother, he then stabbed the two children as well, multiple times. Again, causing some injuries specifically to Anna Reyes who received stab wounds to the right shoulder and along her spine in the middle of her back where she then was paralyzed in one leg as a result of the injuries, again, apparently due to a spinal cord

4

| | |
|---|---|
| 1 | injury. Christina Reyes suffered minor injuries and did recover as well as Emilia Castillo. [¶] |
| 2 | [Petitioner] has, on previous occasions, inflicted or attempted to inflict serious injury on the victim, has a record of violence and assaultive behavior, escalating pattern of criminal conduct and violence, has a history of unstable and tumultuous relationships with others and, again, (inaudible) in this incident so he has had prior relationships, other female relationships that he's had. [¶] |
| 3 | Previously, he's sexually assaulted another in the matter calculated to inflict pain and fear upon that victim and failed previous grants of probation and parole and cannot be counted upon to avoid criminality. He failed to profit from society's previous attempts to correct his criminality including juvenile probation, adult probation, parole, CYA commitment and a prior prison term. [¶] |


injury. Christina Reyes suffered minor injuries and did recover as well as Emilia Castillo. [¶]

[Petitioner] has, on previous occasions, inflicted or attempted to inflict serious injury on the victim, has a record of violence and assaultive behavior, escalating pattern of criminal conduct and violence, has a history of unstable and tumultuous relationships with others and, again, (inaudible) in this incident so he has had prior relationships, other female relationships that he's had. [¶]

Previously, he's sexually assaulted another in the matter calculated to inflict pain and fear upon that victim and failed previous grants of probation and parole and cannot be counted upon to avoid criminality. He failed to profit from society's previous attempts to correct his criminality including juvenile probation, adult probation, parole, CYA commitment and a prior prison term. [¶]

It's indicated that he's had an unstable social history. Again, in today's discussion, [Petitioner] is growing up, grew up in a very abusive home. His mother being very physically and emotionally abusive towards him, his brothers and sisters. [¶]

His prior criminal history which does include juvenile arrests for resisting arrest, disturbing the peace, as well as, forcible rape charged and resulted in a prison term. Adult convictions, a voluntary manslaughter with the use of a weapon and false information to a peace officer. [¶]

The prisoner has programmed in a limited manner while incarcerated, has not sufficiently participated in beneficial self help and, again, he has to benefit further in these areas to gain more insight, has failed to understand, again, in regard to misconduct while incarcerated, you only have one 128 counseling chrono since your incarceration dating back to October of '97 for manipulation of staff, serious 115 disciplinary reports, December of 1994, responsibility of the mail content. [¶]

The psychological report from Doctor Schroeder which is dated January 27th of 2006 is not supportive of your release. There are some issues there regarding, as mentioned, of again, under diagnosis Axis II diagnosis, antisocial personality disorder. . . . I want to go back to Doctor Schroeder's and one thing that I do want to address with Doctor Schroeder's is that it did not really address your psychosexual problems. There is some discussion of it in Doctor Walker's case concerning, again, in talking about your offense with the forcible rape and, again, today, you showed some inconsistencies in regards to what you told Doctor Walker as to what you told today as regards drugs being an issue concerning that particular crime. . . . Again, something a little different in versions to, again, you did indicate drunk [sic] but mainly your, your main motivation there was for sex. . . . [¶]

The Panel makes the following findings: that [Petitioner] needs self help in order to face, discuss, understand and cope with stress in a non-destructive manner. Until progress is made, [Petitioner] continues to be unpredictable and a threat to others. . . .

(Pet. 45-52, 132-38.)

## PETITIONER'S CLAIM

Petitioner alleges his right to due process was violated when he was found unsuitable for parole on immutable factors that are no longer reliable evidence that he is a current threat to public safety. (Pet. 4.)

## STANDARD OF REVIEW

The current Petition was filed after the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA"), was signed into law and is thus subject to its

provisions. *See Lindh v. Murphy*, 521 U.S. 320, 326-327 (1997). The standard of review applicable to Petitioner's claims is set forth in 28 U.S.C. § 2254(d), as amended by the AEDPA:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under the AEDPA, the "clearly established Federal law" that controls federal habeas review of state court decisions consists of holdings (as opposed to dicta) of Supreme Court decisions "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). To determine what, if any, "clearly established" United States Supreme Court law exists, the court may examine decisions other than those of the United States Supreme Court. *LaJoie v. Thompson*, 217 F.3d 663, 669 n.6 (9th Cir. 2000). Ninth Circuit cases "may be persuasive." *Duhaime v. Ducharme*, 200 F.3d 597, 598 (9th Cir. 2000) (as amended). On the other hand, a state court's decision cannot be contrary to, or an unreasonable application of, clearly established federal law if no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas petitioner raised in state court. *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004); *see also Carey v. Musladin*, 549 U.S. 70, 76-77 (2006).

A state court decision is "contrary to" clearly established federal law if the decision either applies a rule that contradicts the governing Supreme Court law, or reaches a result that differs from the result the Supreme Court reached on "materially indistinguishable" facts. *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam); *Williams*, 529 U.S. at 405-06. When a state court decision adjudicating a claim is contrary to controlling Supreme Court law, the reviewing federal habeas court is "unconstrained by § 2254(d)(1)." *Williams*, 529 U.S. at 406. However, the state court need not cite or even be aware of the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8.

State court decisions which are not "contrary to" Supreme Court law may only be set aside on

federal habeas review "if they are not merely erroneous, but 'an *unreasonable* application' of clearly established federal law, or are based on 'an *unreasonable* determination of the facts.'" *Early*, 537 U.S. at 11 (*quoting* 28 U.S.C. § 2254(d)). Consequently, a state court decision that correctly identified the governing legal rule may be rejected if it unreasonably applied the rule to the facts of a particular case. *Williams*, 529 U.S. at 406-10, 413; *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002) (per curiam). However, to obtain federal habeas relief for such an "unreasonable application," a petitioner must show that the state court's application of Supreme Court law was "objectively unreasonable." *Woodford*, 537 U.S. at 24-25, 27. An "unreasonable application" is different from an "erroneous" or "incorrect" one. *Williams*, 529 U.S. at 409-10; *see also Waddington v. Sarausad*, 129 S. Ct. 823, 831 (2009); *Woodford*, 537 U.S. at 25.

A state court factual determination must be presumed correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Furthermore, a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).

## DISCUSSION

Petitioner alleges his right to due process was violated when he was found unsuitable for parole on immutable factors that are no longer reliable evidence that he is a current threat to public safety. (Pet. 4.) Because the California Supreme Court summarily denied this claim, the Court must "look through" to the last reasoned decision, that of the Fresno County Superior Court on habeas review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-05 (1991). In rejecting Petitioner's claim, the superior court stated:

> Having considered the petition for writ of habeas corpus filed on June 15, 2007 the court finds that [Petitioner] has not stated a prima facie case for relief.
> . . . .
> Whether or not this court agrees with the Board's conclusion, its decision may not be overturned so long as it is supported by "some evidence." (See, e.g., *In re Fuentes* (2005) 135 Cal.App.4th 152, *In re Shaputis* (2005) 135 Cal.App.4th 217, *In re Lowe* (6th Dist. 2005) 130 Cal.App.4th 1405, *Rosas v. Nielsen* (9th Cir. 2005) 428 F.3d 1229, *In re DeLuna* (2005) 126 Cal.App.4th 585, *In re Scott* (2005) 119 Cal.App.4th 871, *In re Van Houten* (2004) 116 Cal.App.4th 339, *Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910, and *In re Rosenkrantz* (2002) 29 Cal.4th 616.)
> Here, the court finds that there was at least some evidence that releasing [Petitioner] could pose an unreasonable risk to society or a threat to public safety, because of the violent nature of the original offense, and the escalating pattern of [Petitioner's] criminal conduct before the murder. The facts on the record tend to show that the underlying offense was "cruel or callous." Petitioner stabbed his girlfriend,

7

Amelia Castillo, multiple times after arguing with her. (Exhibit E to petition, parole hearing transcript, pp. 11-14.) When the victim's eleven-year-old daughter, Anna Reyes, attempted to call 911, he stabbed her multiple times as well. (*Id.* at p. 14.) Another of the victim's daughters, Christina, age nine, ran to the neighbors' apartment to get help, and [Petitioner] dragged her by the hair back to the apartment and stabbed her multiple times. (*Ibid.*) Petitioner then put the knife in Amelia's hand and tried to get her to stab him. (*Id.* at p. 15.) When she was too weak to stab him, he stabbed himself in the chest, causing minor injuries. (*Id.* at p. 15.)

Amelia suffered three stab wounds to the shoulder and two to her left thigh, but none entered her body cavity and she was discharged from the hospital about five days after the incident. (*Id.* at p. 16.) Anna suffered a stab wound to her right shoulder and another along her spine in the middle of her back. (*Ibid.*) She suffered paralysis in on leg caused by spinal cord injury from the stab wound. (*Ibid.*) Christina suffered four stab wounds in the back, one in the left side, two in the right flank, one in the right tricep, one in the left big toe, and possibly one in the right foot. (*Id.* at p. 17.) She had difficulty breathing without oxygen after her admission and she had a chest tube inserted. (*Ibid.*) She was discharged from the hospital about twelve days after the incident.

Thus, the evidence shows that [Petitioner] committed a very violent and prolonged attack against his girlfriend and her two daughters. While [Petitioner] fortunately did not kill any of his victims, he did cause severe injuries, including partial paralysis in Anna's right leg. Therefore, there was more than enough evidence for the Board to conclude that [Petitioner] acted in manner that demonstrates an exceptionally callous disregard for human suffering and life. (*Id.* at p. 97.)

Also, the record shows that [Petitioner's] life crime was only the latest in a series of escalating acts of violence, which were for the most part directed against women. Petitioner was sent to California Youth Authority when he was fifteen years old for theft. (Exhibit L, Psychological Evaluation dated March 2004, p. 10.) When he was sixteen, [Petitioner] was committed to CYA for raping a nine-year-old girl. (*Id.* at pp. 45-46.) When he was eighteen, he was convicted of voluntary manslaughter and sentenced to five years in prison. (Exhibit L, Psychological Evaluation dated March 2004, p. 10.) After being released on parole, [Petitioner] was arrested three times for driving under the influence and carrying a weapon. (*Ibid.*) He has also been arrested for giving a false identification to police. (*Ibid.*) In addition, he has a history of domestic violence against multiple female partners, including the victim in the present case. (*Ibid.*) He was on probation at the time that he committed the life offense, thus indicating that he has failed to benefit from parole or probation. (*Ibid.*) Therefore, there was at least some evidence to support the Board's conclusion that [Petitioner] has a history of violent behavior against women, and that he was [sic] failed previous grants of probation and parole and cannot be counted on to avoid criminality. (Parole Hearing Transcript, p. 99.)

The Board also noted that the most recent psychological report is not supportive of [Petitioner's] release, and that Dr. Schroeder found that [Petitioner] has an "antisocial personality disorder." (*Id.* at 100.) In addition, the Board pointed out that Dr. Schroeder believed that [Petitioner] would require Narcotics Anonymous and Alcoholics Anonymous participation as a condition of his parole. (*Ibid.*) Again, the Board's conclusions are supported by the evidence in the record. Therefore, since there is at least some evidence to support the Board's decision, the court cannot overturn the Board's decision to deny parole.

. . . .

The petition is denied.

(Answer Ex. 2.)

Preliminarily, to the extent Petitioner contends that the Board and/or the California courts violated state law, such a claim is not cognizable on federal habeas review. *See Estelle v. McGuire*, 502

U.S. 62, 67-68 (1991); *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996) (stating a petitioner may not transform a state-law issue into a federal one by simply asserting a violation of due process).

Current State of the Law

A federal due process claim is analyzed in two steps. *See Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1127 (9th Cir. 2006). "[T]he first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Id.* (*quoting Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)).

The Ninth Circuit has found it clearly established federal law that California "vests . . . California prisoners whose sentences provide for the possibility of parole with a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of the Due Process Clause." *Irons v. Carey*, 505 F.3d 846, 850-51 (9th Cir. 2007) (as amended) (*citing Bd. of Pardons v. Allen*, 482 U.S. 369, 377-78 (1987); *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 12 (1979); *Sass*, 461 F.3d at 1128; *Biggs v. Terhune*, 334 F.3d 910, 914 (9th Cir. 2003); *McQuillion v. Duncan*, 306 F.3d 895, 903 (9th Cir. 2002)). A prisoner is entitled to notice of the parole hearing, an opportunity to be heard, and if parole is denied, a statement of reasons for the denial. *See Greenholtz*, 442 U.S. at 16; *Jancsek v. Or. Bd. of Parole*, 833 F.2d 1389, 1390 (9th Cir. 1987).

The Ninth Circuit has also found that "the Supreme Court ha[s] clearly established that a parole board's decision deprives a prisoner of due process with respect to this interest if the board's decision is not supported by 'some evidence in the record,' *Sass*, 461 F.3d at 1128-29 (citing *Superintendent v. Hill*, 472 U.S. 445, 457 (1985)); *see also Biggs*, 334 F.3d at 915 (citing *McQuillion*, 306 F.3d at 904), or is 'otherwise arbitrary,' *Hill*, 472 U.S. at 457." *Irons*, 505 F.3d at 851. "Additionally, the evidence underlying the board's decision must have some indicia of reliability." *McQuillion*, 306 F.3d at 904 (*quoting Jancsek*, 833 F.2d at 1390); *see Rosas v. Nielsen*, 428 F.3d 1229, 1232 (9th Cir. 2005) (per curiam). The Supreme Court has elaborated the "some evidence" standard:

> Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that

could support the conclusion reached by the . . . board. . . . The fundamental fairness guaranteed by the Due Process Clause does not require courts to set aside decisions of prison administrators that have some basis in fact.

*Hill*, 472 U.S. at 455-56 (citations omitted). When assessing whether a state parole board's suitability determination was supported by "some evidence" in a habeas case, the analysis is "framed by the statutes and regulations governing parole suitability determinations in the relevant state." *Irons*, 505 F.3d at 851 (*citing Biggs*, 334 F.3d at 915).

Thus, the Court "must look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole, and then must review the record in order to determine whether the state court decision holding that these findings were supported by 'some evidence' . . . constituted an unreasonable application of the 'some evidence' principle articulated in *Hill*, 472 U.S. at 454." *Irons*, 505 F.3d at 851.

The Board's parole suitability decisions are governed by California Penal Code section 3041 and title 15, section 2402 of the California Code of Regulations. *See In re Lawrence*, 44 Cal. 4th 1181, 1201-02 (2008).[5] The Board "shall normally set a parole release date" one year prior to the inmate's minimum eligible parole release date, and shall set the date "in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public." *Id.* at 1202; *see* Cal. Penal Code § 3041(a). A release date must be set "unless [the Board] determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration." *Lawrence*, 44 Cal. 4th at 1202; *see* Cal. Penal Code § 3041(b).

Title 15, section 2402 of the California Code of Regulations is designed to guide the Board's assessment of whether the inmate poses "an unreasonable risk of danger to society if released from prison," and thus whether he or she is suitable for parole. *Lawrence*, 44 Cal. 4th at 1202; *see* Cal. Code Regs. tit. 15, § 2402(a). "All relevant, reliable information available to the panel shall be considered in determining suitability for parole." Cal. Code Regs. tit. 15, § 2402(b). The regulation lists factors

---

[5] The Court "must look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole," *Irons*, 505 F.3d at 851, and accordingly utilizes *In re Lawrence* and *In re Shaputis*, 44 Cal. 4th 1241 (2008) as the latest California Supreme Court cases discussing parole suitability. *See Estelle*, 502 U.S. at 67-68 (stating a federal court is bound by a state court's construction of its own laws); *see also Bradshaw*, 546 U.S. at 76.

10

relating to suitability and unsuitability for parole. *See id.* § 2402(c), (d). The *Lawrence* court stated:

> [T]he core determination of "public safety" under the statute and corresponding regulations involves an assessment of an inmate's *current* dangerousness. . . . These factors are designed to guide an assessment of the inmate's threat to society, *if released*, and hence could not logically relate to anything but the threat *currently* posed by the inmate.
> . . . .
> [U]nder the statute and the governing regulations, the circumstances of the commitment offense (or any of the other factors related to unsuitability) establish unsuitability if, and only if, those circumstances are probative to the determination that a prisoner remains a danger to the public. It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public.

*Lawrence*, 44 Cal. 4th at 1205-06, 1212.

"Accordingly, when a court reviews a decision of the Board or the Governor, the relevant inquiry is whether some evidence supports the *decision* of the Board or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings." *Id.* at 1212.

With regard to the Board's reliance solely on the commitment offense to deny parole, the *Lawrence* court held:

> [A]lthough the Board and the Governor may rely upon the aggravated circumstances of the commitment offense as a basis for a decision denying parole, the aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety.

*Lawrence*, 44 Cal. 4th at 1214. The California Supreme Court then gave an example of when a prisoner's commitment offense could show present dangerousness:

> [C]ertain conviction offenses may be so "heinous, atrocious or cruel" that an inmate's due process rights would not be violated if he or she were to be denied parole on the basis that the gravity of the conviction offense establishes current dangerousness. In some cases, such as those in which the inmate has failed to make efforts toward rehabilitation, has continued to engage in criminal conduct postincarceration, or has shown a lack of insight or remorse, the aggravated circumstances of the commitment offense may well continue to provide "some evidence" of current dangerousness even decades after commission of the offense.
> . . . .
> [W]here the record also contains evidence demonstrating that the inmate lacks insight into his or her commitment offense or previous acts of violence, even after rehabilitative programming tailored to addressing the issues that led to commission of the offense, the aggravated circumstances of the crime reliably may continue to predict current

11

dangerousness even after many years of incarceration.

*Lawrence*, 44 Cal. 4th at 1228;[6] *see also In re Shaputis*, 44 Cal. 4th 1241 (2008).

Analysis

Applying the aforementioned framework, some evidence in the record supports the Board's finding that Petitioner was not suitable for parole and would pose an unreasonable risk of danger to society and a threat to the public safety if released from prison. *Hill*, 472 U.S. at 455-56; *Irons*, 505 F.3d at 851; *Lawrence*, 44 Cal. 4th at 1205-06, 1212. The Fresno County Superior Court stated that the following reasons in the Board's denial of parole found support in the record: 1) the violent nature of the original offense, 2) the escalating pattern of Petitioner's criminal conduct before the commitment offense, and 3) Petitioner's most recent psychological report was not supportive of Petitioner's release. (Answer Ex. 2.)

As stated by the Board, the commitment offense was "carried out in an especially cruel and callous manner" and "in a manner which demonstrates an exceptionally callous disregard for human suffering and life." (Pet. 132); *see* Cal. Code Regs. tit. 15, § 2402(c)(1)(D). In addition, the Board stated that the motive for the crime was inexplicable. (Pet. 133); *see* Cal. Code Regs. tit. 15, § 2402(c)(1)(E). Furthermore, the Board stated that multiple victims were attacked and injured in the same incident. (Pet. 132); *see* Cal. Code Regs. tit. 15, § 2402(c)(1)(A). These factors of unsuitability for parole are supported by the facts of the commitment offense recited by the Board and Petitioner's conviction. *See supra* Factual Background; 28 U.S.C. § 2254(e)(1).

Petitioner also had an escalating pattern of criminal conduct before the commitment offense, particularly against women. As stated by the Board, Petitioner "on previous occasions, inflicted or

---

[6] With regard to a parole board's denial based solely on the commitment offense, the Ninth Circuit has stated, in a decision rendered *before Lawrence*'s clarification, that:
> [I]n all the cases in which we have held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence. Specifically, in *Biggs*, *Sass*, and here, the petitioners had not served the minimum number of years to which they had been sentenced at the time of the challenged parole denial by the Board. *Biggs*, 334 F.3d at 912; *Sass*, 461 F.3d at 1125. All we held in those cases and all we hold today, therefore, is that, given the particular circumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms.

*Irons*, 505 F.3d at 853-54.

attempted to inflict serious injury on the victim" before the commitment offense. (*See* Pet. 111-13); Cal. Code Regs. tit. 15, § 2402(c)(2). When he was sixteen years old, Petitioner broke into a residence and raped a nine-year-old girl while wrapping a rope around the victim's neck and threatening to choke her. (Pet. 80-81); *see* Cal. Code Regs. tit. 15, § 2402(c)(4) (listing a factor of unsuitability "Sadistic Sexual Offenses[:] The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim"). Later, in 1980, Petitioner committed voluntary manslaughter and spent five years in prison. (Pet. 82.) Petitioner committed "aggressive, assaultive and/or threatening behaviors towards women in nine separate incidents from 1986 to the index offense in 1990." (Pet. 167.) Furthermore, Petitioner was on probation at the time of his involvement in the commitment offense. (*Id.*)

In addition, Petitioner's most recent psychological report, dated January 27, 2006, approximately ten months before the parole hearing, was not supportive of Petitioner's release. (*See* Pet. 156.) The author of the report, Dr. Corinne Schroeder, found that Petitioner has "Antisocial Personality Disorder." (*Id.* 155.) Dr. Schroeder stated in her clinical observations and recommendations section of her report:

> AA/NA [Alcoholics Anonymous/Narcotics Anonymous] and drug/alcohol testing as a condition of parole are warranted. [Petitioner's] crime was especially brutal. *Despite his good programming, how many people would be willing to have him live next door?* He would have served himself better had his statement of remorse not included mention of his victim's forgiveness. Forgiveness does not mitigate his crime. *He has more soul searching to do*. [Petitioner] can be counted on to continue his excellent programming.

(*Id.* 156 (emphasis added)); *see* Cal. Code Regs. tit. 15, § 2402(c)(5) (listing as a factor of unsuitability "Psychological Factors[:] The prisoner has a lengthy history of severe mental problems related to the offense"); *id.* § 2402(d)(3) (listing as a factor of suitability "Signs of Remorse").

In consideration of the aforementioned circumstances, the Fresno County Superior Court had "some evidence," consistent with *Hill*, 472 U.S. at 454, to conclude that Petitioner constitutes a current threat to public safety as articulated in *Lawrence* and in the California statutes and regulations defining parole suitability, based on 1) the gravity of the commitment offense, 2) the escalating pattern of Petitioner's criminal conduct before the commitment offense, and 3) Petitioner's most recent

1  psychological report. *See Irons*, 505 F.3d at 851.[7]

Accordingly, the Court finds that the California courts' rejection of Petitioner's claim was neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. Thus, habeas relief is not warranted on this claim.

## **Certificate of Appealability**

Because Petitioner challenges the denial of parole, a certificate of appealability is not required. *See* 28 U.S.C. § 2253(c)(1)(A); *Rosas*, 428 F.3d at 1231-32 (finding habeas petitioner was not required to obtain certificate of appealability where "target" of his challenge was not state court judgment or sentence but state Board's administrative decision to deny parole).

## **CONCLUSION AND ORDER**

For the reasons discussed above, the Court DENIES the Petition for Writ of Habeas Corpus with prejudice. The Clerk of Court is ORDERED to enter Judgment for Respondents and to close Case No. CV F 08-01852 LJO WMW HC.

IT IS SO ORDERED.

**Dated:   May 11, 2009**               /s/ Lawrence J. O'Neill
                                        UNITED STATES DISTRICT JUDGE

---

[7] The Court notes that, as of the December 5, 2006, parole hearing, Petitioner had completed his fifteen-year determinate sentence. (*See* Pet. 1, 34, 36, 158; Answer Ex. 1 at 104, 107 of 107.) However, the record is unclear as to the minimum term of Petitioner's life sentence. (*See, e.g.*, Pet. 1; Answer Ex. 1 at 104, 107 of 107); *Irons*, 505 F.3d at 853-54 ("All we held in those cases [*Sass*, *Biggs*] and all we hold today, therefore, is that, given the particular circumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms."); *supra* note 6.